David J. **BASILE**, Plaintiff,

v.

The **ELIZABETHTOWN AREA SCHOOL DISTRICT**, The Elizabethtown Area Board of School Directors, et al., Defendants.

No. Civ.A. 98–CV–2257.

United States District Court, E.D. Pennsylvania.

Aug. 12, 1999.

Ronda K. Kiser, Bradley A. Schutjer, Harrisburg, PA, for Plaintiff.

J. Barry Harris, Joseph M. Grace, Philadelphia, PA, for Defendants.

### DECISION AND ORDER

Van ANTWERPEN, District Judge.

Plaintiff David J. Basile ("Plaintiff") brings this action against Defendants The Elizabethtown Area School District, The Elizabethtown Area Board of School Directors, Dr. Allan L. Thrush, Debra Weaver, Steven Houser, Carol Myers, Robert L. Enk, Barbara A. Hippensteel, A. John Larue, Carol A. Miller, Michael S. Moulds, Jamie H. Rowley, Andrew L. Saylor, Thomas M. Troutman, and Kathleen Weaver (collectively referred to as "Defendants"), alleging that he was deprived of his right to a veteran's preference in appointment to a non-civil service position. The suit arises from Plaintiff's two failed attempts to secure a teaching position with the Elizabethtown Area School District. Plaintiff asserts claims for violations of the Fifth Amendment, Eighth Amendment, Ninth Amendment and Fourteenth Amendment. Plaintiff also alleges as a pendent state claim a violation of the Pennsylvania Veterans' Preference Act, 51 Pa.C.S. § 7104. The court has before it Defendants' Motion for Summary Judgment; Plaintiff's Reply to Defendants' Motion; Plaintiff's Motion for Summary Judgment; Defendants' Reply to Plaintiff's Counter–Motion; Defendants' Response to Plaintiff's Reply; and Plaintiff's Second Reply Brief.

On July 8, this court approved a stipulation by Plaintiff and Defendants to decide this case as a non-jury matter on the basis of the Parties' May 25, 1999 stipulation of facts and without a formal trial. We adopt as our findings of fact, under Fed.R.Civ. Pro. 52(a), each of the following numbered paragraphs, taken directly from the jointly-prepared Statement of Facts submitted by the parties. These facts are sufficient to enable us to render a decision on the issues the parties have identified.

Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343 and 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

### I. STIPULATED FACTS

1. The School Board for the Elizabethtown Area School District ("School District") has not approved any written policy regarding Veterans' Preference. The School District has not adopted any written policy regarding Veteran's Preference.

2. The School Board, the Superintendent and the interview team are aware of the Veteran's Preference Act ("VPA").

3. The team that interviewed Mr. Basile has never applied a Veterans' Preference policy to any candidate.

4. The School District receives several hundred applications annually for elementary school teaching positions.

5. Each of these applications is reviewed by at least one member of the elementary school interview team, which consists of principals or acting principals of the elementary schools in the School District.

6. Each applicant must submit a completed application, three recommendations, a copy of his or her resume, a copy of his or her teaching certificate, and certifications for criminal record and a child abuse checks. The applicants, having supplied the required documents, are referred to as candidates.

7. The candidates are divided in alphabetical order among members of the interview team.

8. Each team member uses a district-approved form, the Review of Application for Professional Employment, to rate the applicants on various areas of competency.

9. The team also considers candidates who have previous classroom experience and those who have dual certification in elementary and special education. The team considers dual certification because a number of the classrooms are to include students identified those needing specially designed instruction.

10. For 1995 and 1996, the application form, Review of Application for Professional Employment form and interview checklist do not contain any reference to a candidate's military status.

11. The 1997 application form does mention U.S. military service, in the "other qualification" section.

12. Each candidate is evaluated according to the characteristics in the Review of Application for Professional Employment form, and is given a rating of "A, B or C or unable to assess." The highest rated candidates receive a C and are those first considered for interviews. Average candidates are B candidates, and are rarely considered for interviews. Candidates who will not be considered for an interview receive an A.

13. Requirements for successful candidates include: a 3.5 GPA on a 4.0 scale; an A grade in student teaching; involvement with students outside of the candidate's college studies; some teaching experience; at least three references extolling the qualities that the School District believes are important; and the ability to write correctly and clearly, as evidenced by the application. "C" candidates are those receiving the highest ratings combining those factors.

14. A number of candidates serve as substitutes in the School District, and are known to the principals for whom they work. The principals will discuss their experience working with the substitutes when the applications are being reviewed.

15. Long-term substitutes are observed and measured by the School District's Approved Observation form, and those with strong observations are given a preference for an interview over those who are not. Anything less than a strong observation by a principal will preclude a long-term substitute from receiving a C rating.

16. Day-to-day substitutes are also considered, but only if they receive overall good reports from classroom teachers for whom they substituted. Day-to-day substitutes who receive less than an overall good report are precluded from receiving a C rating.

17. The interview team also considers previously interviewed candidates.

18. Previously interviewed candidates who scored high on the approved elementary administration interview checklist

form are considered strong candidates and are granted interviews.

19. Once a candidate is selected to be interviewed, he or she is interviewed by the available members of the elementary school interview team.

20. The interviewers use standard questions for each interviewee. They complete an interview checklist, and take notes during the interview on the candidate's answers.

21. To the best of the interview team's knowledge, none of the standard questions specifically asked about a candidate's military status.

22. During the interview, the team inquires about a candidate's background and experiences, and considers information contained in the candidate's application or resume.

23. At the end of the interview a writing sample exercise is given to the candidate. It is completed independently. If the candidate previously completed a writing sample, then he or she would not be required to complete the exercise.

24. After an interview, the interview checklist is completed.

25. The points on the checklist are totaled and averaged, with each candidate receiving a rating score.

26. At the completion of the interviews, the team generally discusses the candidates and ranks them according to their scores. The team then determines a minimum threshold score, below which candidates are no longer considered viable.

27. The minimum threshold score to qualify for the in-depth analysis stage varies annually. The score is determined according to the quality of the candidates and the number of positions available that year.

28. During the in-depth analysis stage, the interview team again reviews the candidates. The following factors are considered: how well the candidate matches a particular position, based on teaching philosophy, teaching style, personality, school building and district goals, and overall staffing considerations; the candidate's strengths and weaknesses; and the quality of the candidate's experience and teaching strategies. The interview team may choose to re-interview certain candidates.

29. During the in-depth stage no pre-approved forms or checklists are used.

30. At the completion of the in-depth analysis stage, the only remaining candidates are those the interview team feels are competent to receive a job offer, pending a background check.

31. Normally there are more candidates than positions after the in-depth analysis stage. The remaining candidates are grouped according to their abilities and the available positions.

32. Background checks, which include contacting references, are conducted of the remaining candidates.

33. The candidates that survive the background checks are those considered competent by the interview team to teach at the elementary school level in the School District. Before this point in the hiring process, a candidate will not be considered competent to receive a job offer for any of the available positions.

34. At this final stage of the hiring process, the remaining candidates are reviewed again and grouped according to their abilities and the available positions.

35. The interview team tries to recommend the best candidate for each available position.

36. If one or more of the candidates in this final pool of candidates is a Veteran, she or he automatically would be recommended for one of the available positions, regardless of whether the Veteran was the best candidate in the remaining group.

37. Once the groupings are determined, the team determines which candidates are available.

38. If the recommended candidate is available, a fifteen to twenty minute interview is scheduled with the Superintendent. Upon the Superintendent's approval, the candidate's name is submitted for hiring to the School Board.

39. The School Board has final authority to hire candidates.

40. David Basile was honorably discharged from the Army in August 1992.

41. Mr. Basile graduated from Millersville University with a 4.0 GPA. He received his Pennsylvania teaching certificate in December 1994, and was a student teacher in the Elizabethtown Area School District.

42. Mr. Basile applied for an elementary school position with the School District in May 1995. His application was one of several hundred received for positions in the School District.

43. Carol Myers, Deborah Weaver, Steven Houser and Barry Ferguson comprised the interview team for the 1995–1996 school year.

44. Steven Houser reviewed Mr. Basile's application and scored it as a "C," recommending him for an interview.

45. The interview team discussed and evaluated the candidates and ranked them according to their scores. Mr. Basile's score of 64.25 ranked sixth out of the seventeen candidates.

46. The team determined that those candidates with a score of 62.0 or above would be selected for the in-depth analysis stage. Mr. Basile was included in the group of thirteen candidates to move into the in-depth analysis stage.

47. Upon completion of the in-depth analysis stage, the interview team concluded that Mr. Basile was not among the candidates who would continue to be considered for the five available positions.

48. The interview team determined that only eight of the remaining candidates merited moving into the background-check stage. Of those eight remaining candidates, five had interview scores higher than Mr. Basile's, and three had scores lower than Mr. Basile's score.

49. All eight candidates passed the background check stage.

50. None of the eight candidates, each of whom was considered competent to teach at the elementary school level in the School District, was a veteran. Therefore, the interview team did not apply the VPA.

51. The remaining eight candidates were reviewed again and then grouped according to their abilities and the positions available.

52. The availability of each of the candidates was determined.

53. At the conclusion of the interview process, the interview team recommended Rose Block, Heather Grimm, Amy Mayer, Eleanor Kimmel and Mary Beth Will for employment. Among those, Mary Beth Will was the only candidate with a lower interview score than Mr. Basile.

54. Mr. Basile reapplied for an elementary school position with the School District for the 1996–1997 school year.

55. The interview team again comprised Carol Myers, Deborah Weaver, Steven Houser and Barry Ferguson, and the procedures followed were the same as those used for the 1995–1996 year.

56. Mr. Basile was selected for an interview because he received high scores from his interview the previous year. He was one of 9 candidates selected for interviews.

57. After the interviews, the team discussed and evaluated the candidates, ranking them according to their scores. Mr. Basile's score of 48 ranked eighth out of nine candidates.

58. The interview team decided that a score of 55.3 was necessary to move into the in-depth analysis stage of the hiring process.

59. Mr. Basile was not one of the six remaining candidates to proceed to the in-depth analysis stage, since he scored below 55.3.

60. During the two years that Mr. Basile was interviewed, the team was aware of his military service. Mr. Basile included references to his veteran status in his application and on his resume, and his military experience was discussed during his interviews.

## II. DISCUSSION

### A. Claims Under 42 U.S.C. § 1983

In his Section 1983 claims, Plaintiff alleges that Defendants, by failing to give him a hiring preference under the Pennsylvania VPA, violated his rights under the Constitution of the United States. Specifically, he claims violations of the Fourteenth, Fifth, Eighth and Ninth Amendments. Defendants assert that Plaintiff was not entitled to a preference under the Pennsylvania statute, and therefore had no property right to assert under the Fourteenth Amendment, and no claim under state law. They argue furthermore that he has no viable claims under the Fifth, Eighth or Ninth Amendments. Finally, Defendants claim that in any case they are entitled to qualified immunity, Eleventh Amendment immunity, and various immunities arising from Pennsylvania statutes.

Section § 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges or immunities secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983. Section 1983 does not create substantive rights, but "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir.1996). A plaintiff seeking to advance a claim under Section 1983 must establish: (1) the deprivation of a right secured by the United States Constitution or federal law; and (2) that the alleged violation was

committed by a person acting under color of state law. *Id.; Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In this case, no party disputes that Defendants were acting under color of state law when Plaintiff's two applications for a teaching position were considered and rejected. Therefore, we must consider whether Plaintiff has proven the deprivation of any right guaranteed by the Constitution or federal law.

### 1. Fourteenth Amendment Claim

Under the Fourteenth Amendment, an individual cannot be deprived of a property right without due process of law. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Property interests are not created by the Constitution, but are defined by existing rules or understandings stemming from state law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Loudermill.* To have a property interest in a claimed benefit, a plaintiff must demonstrate more than a unilateral expectation of receiving the benefit; state law must support a legitimate claim of entitlement. *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. 2701; *Midnight Sessions Ltd. v. City of Philadelphia*, 945 F.2d 667, 682 (3d Cir.1991).

Plaintiff has alleged that Defendants violated his right to procedural due process by failing to implement a veteran's preference with respect to his teaching application. He argues that § 7104(a) of the Pennsylvania VPA, which in relevant part confers on an eligible, qualified veteran a right of preference in receiving an appointment to a non-civil service public position, creates a property interest with due process protection under the United States Constitution. *See* 51 Pa.C.S.

§ 7104(a).[1]  It is well-settled that state entitlements arising in employment situations can create constitutional property interests.  *See, e.g., Loudermill,* 470 U.S. 532, 105 S.Ct. 1487; *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1077 (3d Cir.1990).  Although the existence of a property right under § 7104(a), for appointment to a non-civil service position, has not been previously considered, the Third Circuit has established that property rights inhere in similar VPA provisions.

In *Carter v. City of Philadelphia,* a property right was found to exist in VPA § 7104(b), which mandates a veterans' preference in promotions to civil service positions.  989 F.2d 117 (3d Cir.1993).  The court held that the mandatory preference for a promotion is an entitlement giving rise to a valid § 1983 claim, though it cautioned that the "interest is not in the promotion per se but in being given a preference...." *Id.* at 122.  Similarly, the Third Circuit concluded in *Markel v. McIndoe* that § 7104(b) contemplates "a mandatory promotional preference for veterans over nonveterans," and can serve as the basis for a constitutionally-protected property interest.  59 F.3d 463, 467 (3d Cir.1995).

The court in *Giles v. Dunmore Borough Council* found that the civil service appointment provisions of VPA § 7104(b) create a property interest for those veterans qualified under the terms of the statute.  1997 WL 129308 (M.D.Pa. March 18, 1997).  The court based its finding on *Markel,* noting that the statutory provision at issue was the same in both cases.  *Giles, 1997 WL 129308* at *3.  *Giles* accorded with the earlier decision of *Buclary v. Borough of Northampton,* which involved the preference mandated for any veteran on a civil service eligibility list, "notwithstanding, that his name does not

stand highest ... on the list."  1991 WL 133851 (E.D.Pa. July 17, 1991) (*quoting* 51 Pa.C.S. § 7104(b)).  The court held that the interests of two veteran applicants for civil service positions were found to have risen "to the level of a 'legitimate claim of entitlement' and, therefore, are 'property' protected by the Due Process Clause."  1991 WL 133851, *4 (E.D.Pa. July 17, 1991) (*citing Loudermill,* 470 U.S. at 538–539, 105 S.Ct. 1487).  *Id.*

We find by similar reasoning and logical extension of the rulings discussed above, which involve civil service promotions and appointments, that a property interest inheres in VPA § 7104(a), concerning non-civil service appointments and promotions.  The Pennsylvania Supreme Court has concluded that § 7104(a) entitles a veteran qualified for a particular position with a public employer to a preference over non-veterans for that position.  *Brickhouse v. Spring–Ford Area Sch. Dist.,* 540 Pa. 176, 180, 656 A.2d 483 (1995).  That entitlement, just as the entitlements in § 7104(b), gives rise to a property right that is subject to due process protections under the Fourteenth Amendment.  *See Buclary,* 1991 WL 133851 at *4–5.

Of course, as the cases discussed above make clear, a veteran's property interest under the VPA, § 7104(a) included, rests in the right to preference for appointment, "not an unequivocal right to receive the [appointment] based on status as a veteran." *Giles v. Dunmore Borough Council,* 1997 WL 129308, *2 (M.D.Pa. 1997); *see also Markel* at 474.  Moreover, the only veterans entitled to the preference, and therefore enjoying the protections of due process, are those who are qualified to be appointed or promoted under the statute.  *See, e.g., Brickhouse* at 180–182, 656 A.2d 483.

---

1.  The full text of § 7104(a) reads:
    Non-civil service.—Whenever any soldier possesses the requisite qualifications and is eligible to appointment to or promotion in a public position, where no such civil service examination is required, the appointing power in making an appointment or promotion to a public position shall give preference to such soldier.
    51 Pa.C.S. § 7104(a).

We conclude that Plaintiff would have enjoyed a property interest in the veterans' preference for hiring if he had been qualified. We do not determine here, nor need we, how exactly the due process requirements of notice and opportunity to be heard would be implemented in the case of a qualified applicant who is denied his or her veteran's preference, because we find that Plaintiff did not have a property right under the statute.[2] It is clear from the Stipulated Facts that the hiring committee did not deem Plaintiff qualified to teach either of the two times he applied for a teaching position with the School District, and so he was not due a preference over other applicants.

■ Under controlling Pennsylvania law, a veteran "must be given 'preference' " under § 7104(a) only if he possesses the necessary qualifications for a position as determined by the hiring body. *Brickhouse* at 180, 656 A.2d 483. The statutory requirement that a veteran possess "the requisite qualifications" means that he "must be able to accomplish 'proper performance of public duties.' " *Id.* at 183, 656 A.2d 483 (*citing Graham v. Schmid,* 333 Pa. 568, 573–574, 3 A.2d 701 (1938)); 51 Pa.C.S. § 7104(a).

In *Brickhouse,* the plaintiff had been denied a teaching position based on the school district's determination that he was not qualified. *Id.* The court found that the ability "to accomplish 'proper performance of public duties' " as required by § 7104(a), means that a veteran applicant "first must demonstrate an ability to carry out the job in question at the level of expertise demanded by the employer" before he can benefit from the statutory preference. *Id.* at 183, 184, 656 A.2d 483 (citations omitted). In particular, the

court found that a school district's employment criteria are valid if they are rationally related to the job. *Id.* at 185, 656 A.2d 483. For instance, the school district in *Brickhouse* sought "high academic performance, outstanding recommendations, current references," and determined that the plaintiff's qualifications were not equal to those standards. *Id.* at 181, 656 A.2d 483. Although the plaintiff's "accomplishments . . . appear[ed] to be many," he nonetheless was not "accomplished in the particular manner sought by the school board." *Id.* at 185, 656 A.2d 483. In sum, despite that plaintiff met the basic requirements for hiring consideration, those qualifications alone did not mandate a hiring preference. *Id.*

■ Plaintiff does not dispute that the Elizabethtown Area School District is free to establish its own criteria in determining when a teaching candidate is qualified for a position. *See Brickhouse* at 181–185; *see also Dickey v. Bd. Of Commissioners of City of Washington,* 658 A.2d 876 (Pa.Cmwlth.1995)[3]. Rather, Plaintiff's argument is that he was in fact qualified and thus entitled to the veterans' preference. He claims that any criteria by which the interview team judged him to be unqualified for a position were invalid under *Brickhouse. See* Pl.'s 6/10/99 Brief at p. 10. Despite Plaintiff's assertions, we find that the qualifications used in the hiring process are entirely reasonable under *Brickhouse,* and the School District did not violate the VPA in rating him insufficiently qualified for hire.

In the instant case, the School District requires the following merely to be granted an interview: a 3.5 GPA; an A grade in student teaching; involvement with

---

**2.** Due process does not mandate a particular result, but only a constitutionally adequate procedure. *See Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The basic procedural requirements in conjunction with property right deprivation are notice and an opportunity for a hearing. *Id.*

**3.** *Dickey* involved a plaintiff was denied a position with the 911 emergency response system. Despite veteran status and a number of job-related qualifications, the court found that he did not satisfy the search committee's standards, and was therefore not qualified. Dickey at 877–80 (*citing Brickhouse* and *Schmid* ).

students outside of the candidate's college studies; teaching experience; at least three excellent references; and the ability to write correctly and clearly. Stip. Facts at ¶¶ 6, 13. During the interview, applicants are asked standard questions and their qualifications are inquired into. *Id.* at 20, 22. Interviewees are scored and ranked according to their scores. *Id.* at 25. The interview team then determines a minimum threshold score below which a candidate cannot advance.[4] *Id.* at ¶ 26. The School District evaluates the remaining applicants in its "in-depth stage," requiring strong showings in the following: how well the candidate matches a particular position, based on a variety of factors; the candidate's strengths and weaknesses; and the quality of the candidate's experience and teaching strategies. Stip. Facts at ¶¶ 28–29. The School District also reviews each candidate with regard to overall staffing considerations. *Id.* The remaining applicants are subject to a background check, including reference checks. *Id.* at 32.

The applicants remaining after the in-depth stage, the point at which Plaintiff was removed from consideration in the process for the 1995–1996 year, and the subsequent background checks are those considered competent for a teaching position.[5] Stip. Facts at ¶¶ 30, 32, 33; *Brickhouse* at 182, 656 A.2d 483. Assuming successful background checks, a preference would be applied for any veteran candidate, who "automatically would be recommended for one of the available positions, regardless of whether the Veteran was the best candidate in the remaining

group." Stip. Facts at ¶ 36. While stringent, each of the requirements and stages is reasonably related to a teaching position for which the applicants contend, and simply attest to the permissible high standards the School District requires of its teachers. *See Brickhouse* at 181, 184, 656 A.2d 483.

Because the School Board did not deem the Plaintiff competent, a term we consider indistinguishable from "qualified" in this context, he was not entitled to a preference under the VPA. Like the *Brickhouse* plaintiff, he had not achieved the minimum qualifications necessary under VPA § 7104(a). *See Brickhouse* at 183–184, 656 A.2d 483; Stip. Facts at ¶¶ 47, 57–59.

Plaintiff points out that two of the candidates who successfully passed the in-depth analysis stage for the 1995–1996 academic year attained lower interview scores than he did. Pl.'s 6/10/99 Br. at p. 16.[6] It appears from the facts that the interview score is used to determine which applicants will be considered in the in-depth stage, and not as a means for determining who will emerge as the best candidates after in-depth investigations. Stip. Facts at ¶¶ 26–27. If an applicant successfully passes the in-depth analysis stage, it is because the interviewing team was impressed, interview scores notwithstanding, with the applicant's match to a particular position, strengths and weaknesses, and experience and teaching strategies. *Id.* at ¶¶ 28–29. At most, the interview scores would be only one factor among many considered during the in-depth analysis stage. *Id.* Therefore, whether a candi-

---

**4.** Plaintiff argues that Defendants violated the VPA by setting a minimum score for applicants in the midst of the hiring process. However, determining how many candidates should advance to the next hiring stage, based on the number of openings, is not an impermissible hiring practice under *Brickhouse*.

**5.** The first time Plaintiff applied to the School District, he ranked sixth out of seventeen candidates who were interviewed, *see* Stip. Facts at ¶ 45, but he was unsuccessful in passing the in-depth stage. *Id.* at ¶ 47. When he

applied for a position for the following year, his interview score was not above the minimum threshold, and he was eliminated as a candidate before the in-depth analysis. *Id.* at ¶¶ 57–59.

**6.** According to the Stipulated Facts, three of the remaining candidates had scores lower than Mr. Basile's score. Stip. Facts at ¶ 48. However, whether the number is two or three is not relevant to our analysis.

date will be considered after the in-depth analysis stage depends not on the interview score that is used merely to qualify for the in-depth stage, but on the actual analysis of candidates that constitutes the in-depth stage itself. *Id.* at ¶ 28.

Plaintiff argues that the point at which "qualification" is determined is too late in the process for the VPA to be of any benefit to veterans. However, as we stated above, the preference would operate to promote those veterans who remained viable candidates after the background check, but who were nonetheless considered less competent than other applicants. Moreover, we find that for Plaintiff to benefit from the VPA, the School District would have had to apply the preference early in the hiring process, before the team had conducted an in-depth examination of the candidates.[7] Stip. Facts at ¶ 47. For the 1996–1997 year, the preference would have to have been applied even earlier, as Plaintiff ranked eight out of the nine candidates interviewed for that year and was not qualified for the in-depth analysis stage. *See id.* at 57.

Plaintiff also argues strenuously that Defendant School District has no policy of giving preference to veterans; but his argument is undermined by the fact, stipulated to by Plaintiff, that the School District would indeed have applied a preference for veterans as a matter of course at a particular point in the hiring process. *See* Stip. Facts at ¶ 36. Plaintiff agrees that, if he had progressed to that point in the process, he would have received the preference due under the VPA. *Id.* at 36, 50. While the facts indicate that no official policy existed in the School District at the time of Plaintiff's applications, *see id.* at ¶¶ 1, 2, a preference would apply at the point the interview team had determined that the only remaining can-

didates for teaching positions were those who were qualified. *Id.* at 36. In other words, the preference would apply at precisely the stage required by *Brickhouse,* to give a qualified veteran preference over qualified non-veterans.

It is true that this preference would be peculiarly meaningless if every applicant deemed competent by the interview team also received a job offer, but such is not the case. Rather, there are normally "more candidates than positions after the in-depth analysis stage," as was true when Plaintiff was applying. Stip. Facts at ¶¶ 31, 51, 53. With the preference, the veteran "automatically would be recommended for one of the available positions, regardless of whether the Veteran was the best candidate in the remaining group," *id.* at ¶¶ 36, which comports exactly with what the Pennsylvania courts intended. *Brickhouse* at 181, 656 A.2d 483.

Moreover, we find no evidence to support Plaintiff's contention that the Defendants somehow fashioned the hiring requirements in order "to specifically defeat the Veterans' Preference Act." Pl.'s 7/30/99 Reply Br. at p. 2. The *Brickhouse* court considered the possibility that "a public employer might be able to formulate qualifications for a job in such a way as to defeat the veterans' preference required by the act." 540 Pa. at 184, 656 A.2d 483. The court suggested that "when such formulations are undertaken in bad faith without regard to legitimate need, they must fail...." *Id.* There is absolutely nothing in the facts to indicate bad faith on the part of any Defendant in the formulation or application of any qualifications for a teaching position. We have already explained that the hiring procedure employed by Defendants was valid, and that it required the application of a preference

---

7. As we stated above, the in-depth analysis is appropriate to hiring decisions for teaching positions. It is during this stage that the team considers "how well the candidate matches a particular position, based on teaching philosophy, teaching style, personality, school building and district goals, and overall staffing considerations; the candidate's strengths and weaknesses; and the quality of the candidate's experience and teaching strategies." Stip. Facts at ¶ 28.

for veterans when the interview team deemed the remaining candidates qualified.

A recent case, *Zablow v. Bd. of Educ. of Sch. Dist. of Pittsburgh,* is further instructive. 729 A.2d 124 (Pa.Cmwlth.1999). The *Zablow* plaintiff was not hired because he was not one of the three highest ranked applicants. *Id.* In *Zablow,* no candidate was considered qualified unless he or she ranked, ultimately, among the top three. Plaintiff points out that a veteran candidate thus qualified would be preferred automatically over the other two candidates, regardless of their standing relative to each other. The procedure in *Zablow* is analogous to the one in this case, in which the School Board winnows the candidates to a select group of qualified individuals, and then applies a preference for any veteran remaining in that group. Whether or not the School District "places another step in the process," Pl.'s 7/30/99 Reply Br. at 5, compared to the process at issue in *Zablow* is irrelevant to whether the hiring process was valid as required by veterans' preference law.

Finally, we note that Plaintiff's argument that Defendants' hiring method was not compliant with the VPA relies for the most part on the *Brickhouse* concurrence. This reliance is misplaced, for the *Brickhouse* court did not adopt the concurring opinion, and that opinion is not controlling law. Plaintiff's frequent reference to the concurrence as the holding of the court is misleading at best; his nebulous arguments based thereon, about the proper and improper use of various subjective criteria, are unsupported by precedent.

Although Mr. Basile's accomplishments, as those of the *Brickhouse* plaintiff, appear to be many, he is not accomplished in the particular manner sought by the Defendants. *See Brickhouse* at 488. We agree with Plaintiff that it appears he was more qualified for the positions to which he applied than was the plaintiff in *Brickhouse,* and his qualifications were obviously apparent to the Defendants, who passed him

through several rounds in the application process. Nonetheless, his accomplishments fail to satisfy the reasonable criteria required by the Defendants. Therefore, he cannot receive the benefit of the VPA.

### 2. Remaining Claims

██ Plaintiff's remaining claims, brought under the Fifth, Eighth and Ninth Amendments of the United States Constitution, have no merit. The due process clause of the Fifth Amendment is limited to acts of the federal government and has no application to state government actions. *See Bartkus v. Illinois,* 359 U.S. 121, 124, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); *Shoemaker v. City of Lock Haven,* 906 F.Supp. 230, 237–38 (M.D.Pa.1995); *Shepherdson v. Nigro,* 5 F.Supp.2d 305, n. 2 (E.D.Pa. 1998). The Eighth Amendment applies only to prisoners who have been convicted of a crime and is irrelevant to the instant case. *Ingraham v. Wright* 430 U.S. 651, 664–665, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (U.S. 1986); *Cerva v. Fulmer,* 596 F.Supp. 86, 89 (E.D.Pa.1984).

██ Finally, the Ninth Amendment does not confer substantive rights in addition to those conferred by other portions of our governing law, and does not independently secure a constitutional right for purposes of pursuing a civil rights claim. *See Strandberg v. City of Helena,* 791 F.2d 744, 748 (9th Cir.1986); *Quilici v. Village of Morton Grove,* 695 F.2d 261, 271 (7th Cir.1982); *U.S. v. LeBeau,* 985 F.2d 563, 1993 WL 21970 (7th Cir.1993). Rather, the Ninth Amendment serves to protect fundamental rights that are not set forth in the Constitution. *Charles v. Brown,* 495 F.Supp. 862, 863 (N.D.Ala.1980); *see also Gibson v. Matthews,* 926 F.2d 532 (6th Cir.1991). Plaintiff has failed to identify any abridged fundamental right implicitly guaranteed by the Ninth Amendment, and cannot maintain the claim.

### 3. Qualified Immunity

■ Because Plaintiff has not proven a violation of a constitutional right, it is unnecessary for this court to rule on Defendants' affirmative defense that qualified immunity protects them from liability. Nevertheless, we conclude that qualified immunity would protect the individual Defendants even if Plaintiff's constitutional rights had been violated.

The Supreme Court established the standard for qualified immunity in *Harlow v. Fitzgerald,* holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Thompson v. Burke,* 556 F.2d 231, 240 (3d Cir.1977) (officials performing administrative or investigatory functions may be entitled to a qualified immunity). The inquiry first requires us to examine whether the conduct of the individual Defendants violated constitutional rights "clearly established at the time the action occurred." *See Harlow* at 818–19, 102 S.Ct. 2727. If so, then the court must address whether an objectively reasonable person in the position of any of the Defendants would have known that his or her conduct was violative of such constitutional rights. *See id.* The immunity is available even where officials "of reasonable competence could disagree" as to whether the conduct complained of was objectively reasonable. *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The Supreme Court has explained the meaning of "clearly established" law for the purposes of a qualified immunity inquiry:

> The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say ... the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted). The Third Circuit has held that a law cannot be regarded as clearly established when there is a lack of substantially similar authority on point. *See Sharrar v. Felsing,* 128 F.3d 810, 828–829 (3d Cir.1997); *Johnson v. Horn,* 150 F.3d 276, 286 (3d Cir.1998); *Pro v. Donatucci,* 81 F.3d 1283, 1292 (3d Cir.1996). Indeed, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In the instant case, Plaintiff has not shown and no facts indicate that Dr. Allan L. Thrush, Debra Weaver, Steven Houser, Carol Myers, Robert L. Enk, Barbara A. Hippensteel, A. John Larue, Carol A. Miller, Michael S. Moulds, Jamie H. Rowley, Andrew L. Saylor, Thomas M. Troutman, or Kathleen Weaver were knowingly violating a constitutional right during the School District's interview and hiring process. Given that the existence of a property right in VPA § 7104(a) was not explicitly decided prior to the instant case, *see supra,* III.A.1., there was no established right at the time of Plaintiff's applications. No reasonable public official could have known that denying a veteran a preference would violate that veteran's property right. *See Anderson* at 640, 107 S.Ct. 3034.

Moreover, we found that although a property right is created by VPA § 7104(a), Plaintiff was not entitled to that right. *See supra,* III.A.1. We also found that there is no constitutional right under the Fifth, Eighth or Ninth Amendments in connection with Plaintiff's alleged injuries. *See supra,* III.A.2. A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is clearly established is whether the plaintiff has asserted a violation of a constitu-

tional right at all. *See Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Because the actions complained of by the Plaintiff do not approach the level of a constitutional violation, the officials involved would clearly be entitled to qualified immunity even if a constitutional right under § 7104(a) were clearly established. *See In re City of Philadelphia Litig.*, 158 F.3d 711, 719 (3d Cir. 1998).

As the threshold issues for our qualified immunity analysis are whether the constitutional right asserted by Plaintiff was clearly established at the time any one of the Defendants acted, *see Siegert* at 232, 111 S.Ct. 1789, and if so, whether or not Defendants' actions violated that right, this court need not move to the analysis of whether the officials' conduct was objectively reasonable. *See Johnson v. Horn*, 150 F.3d 276, 286 n. 7 (3d Cir.1998).

### 4. Municipal Liability

■ A § 1983 charge against a municipality or state officials acting in their official capacities invokes an analysis entirely different from one determining the liability of an individual state actor. Although local governments and governmental entities cannot be sued for vicarious liability as an employer under § 1983, they are not accorded the protection of qualified immunity, and may be held liable for constitutional violations caused by an official policy or custom of the municipality. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Owen v. City of Independence*, 445 U.S. 622, 650, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Therefore, the School District and the Board are subject to § 1983 liability. *See Monell* at 690–91, 98 S.Ct. 2018; *see also* 24 P.S. § 2–211.

■ Moreover, because suing state officials in their official capacity is equivalent to suing the municipality itself, *see Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), such officials may similarly be held liable for instituting an official policy or custom of the municipality. *Monell* at 694, 98 S.Ct. 2018. Only those municipal officers and employees who have final policymaking authority can by their actions subject their municipal employers to § 1983 liability, however. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). It is unclear from the facts which if any of the individual Defendants had policymaking authority; yet such a determination is unnecessary, as Plaintiff has failed to prove that any of the alleged improper actions were taken pursuant to an established policy, practice or custom. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1268 (7th Cir.1984); *Frazier v. City of Philadelphia*, 927 F.Supp. 881, 887 (E.D.Pa.1996); *Di Maggio v. O'Brien*, 497 F.Supp. 870, 874 (E.D.Pa. 1980).

In § 1983 cases against government units, "liability only exists where the constitutional injury results from a municipal policy or custom." *Frazier*, 927 F.Supp. at 887. The Third Circuit has explained that a government policy or custom can be demonstrated in either of two ways:

> [p]olicy is made when a "decision maker possessing final authority to establish municipal policy with respect to the action" issues an official proclamation, policy or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

*Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir.1996) (*quoting Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990), *cert. denied*, 519 U.S. 1151, 117 S.Ct. 1086, 137 L.Ed.2d 219 (1997)). Municipal liability through a course of conduct is established by proving that identified and relevant policy makers within the municipal unit had notice or knowledge of a risk of deprivation of rights through a

pattern of prior deprivations, and by demonstrating that the policy makers acted with "deliberate indifference" to the known risk. *Beck*, at 965–67. A single incident generally cannot establish a "custom" because there can be no "deliberate indifference" without prior knowledge.[8] *City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

To establish municipal liability, Plaintiff would have to show either an official policy not to implement a veterans' preference in hiring, or a like custom so ingrained in the hiring process that it operated as a policy. *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir.1991); *Bielevicz* at 850; *Monell* at 690, 98 S.Ct. 2018. Plaintiff has failed to provide any evidence that the Board's alleged failure to apply the veteran's preference was the result of any custom or policy, as the facts show no prior instances where similarly situated individuals were discriminated against. Although the facts adduce lack of an formally promulgated veterans' preference policy in the School District, they also state that a preference would be applied as required by law for any qualified veteran; in any event, whether or not there was an official veterans' preference policy is irrelevant to the determination of the existence of a policy not to favor qualified veterans. As Plaintiff has failed to prove the required elements for municipal liability, his § 1983 claim against policymaking Defendants would fail even if there was a property interest violation in this case.

## B. Pendent State Law Claims

This court has supplemental jurisdiction over claims arising under the Pennsylvania VPA pursuant to 28 U.S.C. § 1367. Plaintiff argues that Defendants violated VPA § 7104(a) by not granting him the statutory preference over other qualified applicants when it considered him for a teaching position for the 1995–1996 and 1996–1997 academic years. *See* Pl.'s Compl. at p. 9. Our analysis of Plaintiff's Fourteenth Amendment claim required us to examine whether Plaintiff was in fact denied a mandatory preference, *see supra* at II.A.1., which is precisely the issue of the state law claim. Therefore, with reference to our above analysis, we find for Defendants on the state law claim. *See discussion, supra*, at II.A.1. Defendants did not violate the VPA, because Plaintiff was not a qualified veteran entitled to a preference under the statute. *Id.*

## III. CONCLUSIONS OF LAW

Consistent with the above findings of fact and discussion, we make the following conclusions of law:

1. Plaintiff has failed to show by a preponderance of the evidence that he was improperly denied a preference under the Pennsylvania Veterans' Preference Act.

2. Defendants were permitted to establish hiring requirements in their search for teachers as long as the requirements reasonably related to the positions, and the requirements of the Elizabethtown School District for a successful teaching applicant were reasonably related to the positions for which the district was hiring.

3. The Defendants did not violate the VPA by deciding that Plaintiff did not satisfy their requirements and was not a qualified applicant for the 1995–1996 or 1996–1997 school years.

4. Because Plaintiff was not a qualified applicant to Defendant School District, he

---

**8.** Although the Supreme Court has held that the official policy requirement can be satisfied by "a single decision by municipal policymakers under appropriate circumstances," the decision must be made by the official "responsible for establishing final government policy respecting such activity." *Pembaur*, 475 U.S. at 480–483, 106 S.Ct. 1292. The only arguable "decision" relevant to this case would have been made by the interviewing team, which does not appear from any of the facts to have possessed any power to make "final government policy." *Id.; see Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990) (the plaintiff must show that an official with final power to make policy was in fact responsible for the course of action causing the alleged deprivation).

has not proved that he enjoyed a property interest under the Fourteenth Amendment. Therefore, the Defendants did not violate Plaintiff's Fourteenth Amendment property right, and Plaintiff was not entitled to any due process under the United States Constitution.

5. Plaintiff has failed to prove by a preponderance of the evidence that Defendants violated his rights under the Fifth Amendment, which applies only to acts of the federal government.

6. Plaintiff has failed to prove by a preponderance of the evidence that Defendants violated his rights under the Eighth Amendment, which applies only to criminals.

7. Plaintiff has failed to prove by a preponderance of the evidence that Defendants violated his rights under the Ninth Amendment, which does not accord substantive rights in addition to those conferred by other portions of our governing law.

8. The individual Defendants would have been entitled to qualified immunity even if Plaintiff proved that Defendants had violated a property right. The constitutional right was not clearly established, and no reasonable person in the position of any of the Defendants would have understood that denying a veteran a preference would violate that veteran's constitutional property right.

9. Defendants School Board, School District, and any policymaking officials would not have been liable even if Plaintiff showed that Defendants violated a property right under the VPA, because Plaintiff did not show any relevant policy or custom by the municipal Defendants to violate those rights.

10. Plaintiff has failed to show that Defendants violated the Pennsylvania Veterans' Preference Act. Plaintiff was not a qualified applicant under the statute, and was therefore not entitled to the statutory preference.

11. Defendants are entitled to judgment in their favor.