**PENNSYLVANIA GAME COMMISSION,**
Petitioner,

v.

**STATE CIVIL SERVICE COMMISSION (TACCONE), Respondent.**

**Pennsylvania Game Commission,**
Petitioner,

v.

**State Civil Service Commission (Chambers), Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 4, 2001.
Decided Jan. 7, 2002.

William R. Pouss, Harrisburg, for petitioner.

Robert J. DiBuono, New Castle, for respondent.

Frederick C. Smith, Jr., Harrisburg, for intervenor, PA State Civil Service Commission.

Before KELLEY, J., FLAHERTY, Senior Judge, and JIULIANTE, Senior Judge.

FLAHERTY, Senior Judge.

The Pennsylvania Game Commission (Game Commission) petitions for review of two orders of the Pennsylvania Civil Service Commission (Civil Service Commission) ordering the Game Commission to keep Gary R. Taccone and Eric T. Chambers (Respondents) on the eligible list for the position of Game Conservation Officer Trainee. We dismiss the Game Commission's Petitions for Review.

Respondents took a civil service test for the position of Game Conservation Officer Trainee and were placed on the "Eligible List" by the Civil Service Commission. This list was then sent to the Game Commission. Because of their high scores, Respondents were given preference in hiring because of the "Rule–of–Three".[1] Addi-tionally, because they are veterans, Respondents were also given preference in hiring pursuant to the Veterans' Preference Act, 51 Pa.C.S. § 7104.[2] Pursuant to Civil Service Commission Management Directive 580.21, the Game Commission was required to hire Respondents. This management directive is not in the record of this case. However, the case of *Housing Authority of County of Chester v. Pennsylvania State Civil Service Commission,* 556 Pa. 621, 730 A.2d 935 (1999) cites Management Directive 580.21, which states that:

> Persons entitled to veterans' preference under the Military Affairs Act who take civil service examinations for appointment will: (1) Receive 10 additional points on their final earned ratings. (2) Have mandatory appointment preference over non-veterans when their names appear together within the Rule–of–Three on employment certifications.

*Id.* at 634, 730 A.2d at 942. Following receipt of their test scores, Respondents were interviewed by a Game Commission Interview/Selection Panel, which was convened for the purpose of selecting a new class of Trainees for a class to begin on March 18, 2001. On March 8, 2001, following these interviews, the Game Commission filed Requests for Removal of Eligibles pursuant to Management Directive 580.34(3)(a) seeking to have Respondents

---

**1.** The "Rule–of–Three" is found in 71 P.S. § 741.602, which provides, in part:
> If the vacant position is to be filled from among the names of employees on the appropriate promotion list which have been submitted to the appointing authority, he shall select a person, provided he is among the three highest ranking persons on such list . . .
> *See also* 4 Pa.Code § 91.3.

**2.** 51 Pa.C.S. § 7104(b) provides that:
> Whenever any soldier possesses the requisite qualifications, and his name appears on any eligible or promotional list, certified or furnished as the result of any such civil service examination, the appointing or promoting power in making an appointment or promotion to a public position shall give preference to such soldier, notwithstanding, that his name does not stand highest on the eligible or promotional list.
> *See also Com. ex rel. Graham v. Schmid,* 333 Pa. 568, 3 A.2d 701 (1939) (leading case upholding the constitutionality of a veterans' preference).

removed from the list.[3] The Game Commission also filed an accompanying statement setting forth the reasons for its requests as provided by 580.34(3)(b). As to Taccone, the Game Commission stated, in part, that during his interview

> he exhibited what we consider to be an excessive interest in deadly force. He stated that while serving on the Erie Police Force, since September 1997, he had drawn his side arm two hundred to three hundred times ... Mr. Taccone's reported frequency of unholstering his weapon in less than four years as a member of the Erie police force causes us grave concern ... [and] could pose a serious threat to the life and safety of Pennsylvania sportsmen and women as well as those deputies and other officers working with him.

(R.R. at 5a). As to Chambers, the Game Commission stated, in part, that he

> admitted that he illegally killed an injured deer, dispatching it using a ½ inch wrench. The taking of this deer was not reported, which is a violation of State Game Law. The candidate also admitted that there had been numerous violations of the State Game Law on the property he rented, but there is no record of his ever having reported them. We cannot consider an individual for employment as a Game Conservation Officer Trainee who has already violated and is otherwise scornful of the laws he will be empowered to enforce.

(R.R. at 70a).

As provided for by 580.34(3)(c), both Taccone and Chambers responded to these requests by filing written statements defending their eligibility to become Game Conservation Officers Trainees. Taccone responded, in part, that during his interview

> I related that the City of Erie Police Department has a high number of serious calls such as burglaries in progress, robberies, searching/clearing buildings, and reports of violent felonies. I told them in those situations, I may have my weapon in a tactically safe low ready position, for the protection of myself and others, which is not considered deadly force. I then asked the interviewer if he meant this in context to a deadly force situation, relating to where the gun is in a sight picture on the suspect. I replied, approximately twelve to twenty times ... I have always stayed within the City of Erie's Use of Force Policy, which was told to your investigators by myself and my superiors.

(R.R. at 9a–10a). On the Response to Request for Removal of Eligible Form, Taccone also checked the box indicating that he wanted to appear before the Civil Service Commission to present oral argument.

Chambers responded, in part, that

> Safety zone violations did occur on the property. At the time of the violations, I was at work or off the property. My fiancé confronted the violators. Some were very hostile towards her, while others politely left the property ...

> The deer in question collided with my truck ... The deer had a broken back and broken front leg with the bone ex-

---

**3.** Management Directive 580.34 is set forth in pages 7a–8a of the Reproduced Record. "This Court has held that numbered management directives announcing detailed policies, responsibilities and procedures that are relatively permanent in nature and which have been signed by the head of any commission under the Governor's jurisdiction have the force of law when they are based upon authority or duty conferred by constitution, statute or regulation." *Cambria County Mental Health/Mental Retardation v. Pennsylvania State Civil Service Commission (Cotton )*, 756 A.2d 103, 107 (Pa.Cmwlth.2000).

posed. It was heaped up in the middle of the unlit road ... the deer had little or no chance of surviving. Being concerned for my safety and the safety of others, I decided to respond humanely to the situation. I retrieved a half inch ratchet from my tool box ... With one hard swift blow to the base of the skull, the deer's body went limp.

(R.R. at 73a–75a). Chambers stated that he informed a police officer of this incident so that the deer could be removed from the road. He also stated that during his interview he was questioned several times about his employer, who has been accused by the Game Commission of violating State Game Law and who "is currently in court with the Game Commission." (R.R. at 75a). Chambers checked the box indicating that he did not wish to appear before the Civil Service Commission to present oral argument.

On April 19, 2001, the Civil Service Commission entered an Order stating that Chambers "will not be removed from the eligible list ... an appropriate remedy will be provided to [Chambers] in accordance with the requirements of Management Directive 580.34. The State Civil Service Commission's Bureau of Audit and Technical Services will provide advice and Technical Service to the [Game Commission] to ensure compliance with this Order." (R.R. at 84a). On May 7, 2001, the Game Commission sent a letter to the Civil Service Commission requesting a hearing. The letter indicated that there were discrepancies between what Chambers told the Interview/Selection Panel and what he indicated on his written statement. The Game Commission also wanted to "stress the significance of Mr. Chambers having unlawfully killed a deer" (R.R. at 86a). By letter dated May 18, 2001, the Game Commission's request was denied (R.R. at 88a).

Because of Taccone's request, oral argument was held before the Civil Service Commission on April 24, 2001. Pursuant to 580.34(3)(e)(1), both Taccone and the Game Commission presented their arguments. Both parties related essentially the same information contained in their written statements. Taccone added that he had been dispatched to handle 1,175 calls while with the Erie Police Department, "but not to include [the] back up [of] other officers, which would significantly raise that number" (R.R. at 29a; N.T. 4/24/01, p. 16). He also stated that he has a spotless record and that he has never discharged his weapon (R.R. at 32a; N.T. 4/24/01, p. 19). Counsel for the Game Commission stated that the Interview Panel was unanimously concerned about Taccone's attitude with regard to the use of deadly force. With regard to the number of times Taccone reported that he had somebody in the sights of his weapon, counsel for the Game Commission stated that "[e]ach of those instances, regardless of whether the suspect was convicted, regardless of even possibly whether the individual was armed, could be a basis for a federal civil rights action ... it's a situation that the Game Commission feels that it must avoid at all costs and that is why we are asking that Mr. Taccone's name be removed from the list." (R.R. at 25a; N.T. 4/24/01, p. 12).

Following oral argument, the Civil Service Commission issued an Order dated April 26, 2001 identical to the one that it issued for Chambers (R.R. at 60a). On May 14, 2001, the Game Commission sent the Civil Service Commission a letter requesting a hearing and stating that it is very concerned about Taccone's "past frequent use of deadly force ... In addition, there is a need to resolve the discrepancy between the numbers given by the Interview Board and those contained in the response to request for removal" (R.R. at

62a). By letter dated May 18, 2001, the Civil Service Commission denied the Game Commission's request (R.R. at 64a).

Pursuant to the Management Directive, "[s]olely at its discretion, the Commission may determine that a hearing will be necessary to finally decide the request and schedule the matter for hearing." 580.34(3)(e)(3). "If its request is denied, the appointing authority, upon receipt of formal notification from either the Executive Director or the Commission, will consider the eligible for appointment." 580.34(3)(3)(h). "If the appointing authority has filled the position with another candidate from a list or lists upon which the eligible's name was also certified and if the position was one for which the selection of the eligible would have been mandatory but for the pending removal request, the eligible will be promptly offered an equivalent position by the appointing authority." 580.34(3)(3)(h)(1).

On May 24 and May 31, 2001, the Game Commission filed Petitions for Review with regard to both Taccone and Chambers asserting that the Orders of the Civil Service Commission were adjudications and that it was deprived of procedural due process because the Civil Service Commission failed to hold hearings on its removal requests as required by the Administrative Agency Law (AAL), 2 Pa.C.S. §§ 501–508, 701–704. The Game Commission also asserted that the Orders of the Civil Service Commission are arbitrary and capricious because they do not contain any findings or address any of its concerns. By Order of this Court dated June 12, 2001, both Petitions were consolidated and the Civil Service Commission was permitted to intervene as a party. On July 26, 2001, the Game Commission filed an Application for Stay pursuant to Pa.R.A.P. 1781. Argument on that Application was held before this Court on August 1, 2001. On August 8, 2001, this Court filed an unpublished opinion and order denying the Game Commission's Application for Stay.

The Game Commission argues that the orders of the Civil Service Commission were adjudications and that it was deprived of procedural due process because the orders were issued without affording it the opportunity to present its case as to why Respondents should be removed from the Eligible List. In its brief, the Game Commission also argues that because the Civil Service Commission rendered adjudications with regard to Respondents without following the procedures set forth in the AAL, the orders cannot be valid with regard to the Game Commission. The Civil Service Commission argues that its orders were not adjudications with regard to either Respondents or the Game Commission and, as a consequence, the Game Commission was not entitled to a hearing.

Pursuant to Section 101 of the AAL, an adjudication is:

> Any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made ...

2 Pa.C.S. § 101.

Additionally, Section 504 of the AAL provides that:

> No adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard ...

2 Pa.C.S. § 504.

■ Therefore, the first matter this Court must resolve is whether the orders of the Civil Service Commission were adjudications, i.e. whether they were final determinations which affected any of the pro-

tected rights of any of the parties set forth in Section 101 of the AAL. In *Brickhouse v. Spring–Ford Area School District*, 540 Pa. 176, 656 A.2d 483 (1985), the Supreme Court of Pennsylvania held that a veteran must be hired for a civil service position if that veteran also possesses the "requisite qualifications." In a 1999 decision, the Supreme Court took this reasoning one step further in *County of Chester*, holding that the Civil Service Act "clearly requires that mandatory veterans' preference be afforded to any veteran who is applying for a civil service position and who is on an Eligible List due to his performance on the civil service examination." *Id.* at 643, 730 A.2d at 947. The Supreme Court also specifically held that "in the civil service context, a candidate's "ability to perform" is to be measured exclusively by whether the candidate has successfully undergone civil service testing for purposes of determining eligibility for appointment. The appointing authority is not permitted to impose independent requirements to ensure that a specific candidate possesses the requisite qualifications for the job." *Id.* at 640, 730 A.2d at 945.[4]

Although the Supreme Court does not expressly hold that a candidate in this situation has a protected property right, the United States District Court for the Eastern District of Pennsylvania, relying on our Supreme Court's decision in *Brickhouse* and numerous Third Circuit cases involving the Pennsylvania Veterans' Preference Act, held that "[t]he Pennsylvania Supreme Court has concluded that § 7104(a) entitles a veteran qualified for a particular position with a public employer to a preference over non-veterans for that position. That entitlement, just as entitlements in § 7104(b), gives rise to a property right that is subject to due process protections under the Fourteenth Amendment." *Basile v. Elizabethtown Area School District*, 61 F.Supp.2d 392, 399 (E.D.Pa.1999) (citations omitted).[5] The *Basile* Court went on to hold that "the only veterans entitled to the preference, and therefore enjoying the protections of due process, are those who are qualified to be appointed or promoted under the statute." *Id.*

We agree with the reasoning of the Courts in the Eastern District and the Third Circuit. In the case *sub judice*, Respondents do have a protected property right in being placed on the Eligible List for the civil service positions at issue because they met the "requisite qualifications" as measured solely by their performance on the civil service examination and because they enjoy a preference in hiring pursuant to the Veterans' Preference Act.[6]

4. Thus, the maintenance of the Eligible List is the sole responsibility of the Civil Service Commission. When creating the Eligible List, the Executive Director is empowered to assess an applicant's merit and fitness by requiring the applicant "to supply information relevant for determining the possession by the applicant of the minimum requisites for appointment or promotion. The Director may also require an applicant to supply certificates and other appropriate documents from citizens, physicians, public officers, school officials, employers and others having knowledge of the applicant as will be relevant in assessing the applicant's fitness and qualifications for appointment or promotion." 4 Pa.Code 95.1(b).

5. Section 7104(a) gives veterans a hiring preference in non-civil service public positions as opposed to Section 7104(b), which grants veterans a hiring preference in civil service public positions.

6. In fact, in *County of Chester*, the Supreme Court stated that if the Commission had failed to adhere to Management Directive 580.21, it "would have been totally ignoring the clearly expressed will of the legislature regarding the effect of veterans' preference in civil service." *Id.* at 637, 730 A.2d at 943–944. Additionally,

Thus, the decisions of the Civil Service Commission were "adjudications" as to Respondents under Section 101 of the AAL.

■ However, the Civil Service adjudications were favorable to Respondents and, obviously, they have not filed an appeal. Rather, the Game Commission has appealed these orders. The question this Court must answer is whether the Game Commission has been deprived of due process, i.e. whether the Game Commission is entitled to a hearing and the other protections afforded by administrative agency law before the Civil Service Commission can issue an order deciding the Game Commission's request to have Respondents removed from the Eligible List. To answer this question, we must determine: 1) whether the orders of the Civil Service Commission are adjudications of "personal or property rights, privileges, immunities, duties, liabilities or obligations" of the Game Commission, and 2) if the orders did not affect any protected rights of the Game Commission, whether the Game Commission is entitled to a hearing if the orders affect the property rights of another party to the litigation.

■ Based on the Pennsylvania Supreme Court's holdings in *Brickhouse* and *County of Chester*, it is evident that the Game Commission does not have an interest that is protected under Section 101 of

the AAL in keeping Respondents off of the Eligible List. The effect of the Rule of Three and the Veterans' Preference Act is to prevent a public employer from imposing additional hiring criteria upon civil service applicants. To hold otherwise would "defeat the principal purpose of the Civil Service Act by opening the door to the very abuses which civil service testing was designed to protect against." *County of Chester* at 643, 730 A.2d at 947. Because the hiring of Respondents was statutorily mandated by the Civil Service Act and the Veterans' Preference Act, it reasonably follows that it would be impossible for the Game Commission to have a legally protected interest in *not* having Respondents on the Eligible List for the Game Conservation Officer Trainee position to which they had applied.[7] Thus, the orders of the Civil Service Commission did not adjudicate any protected interest of the Game Commission. Accordingly, the Game Commission was not deprived of due process.

■ It also reasonably follows that the Game Commission is not entitled to a hearing when the orders of the Civil Service Commission only affected the rights of Respondents. To be entitled to a hearing, the adjudication would had to have affected a protected right of the Game Commission. *See Pequea Valley School District v.*

"the Civil Service Act independently supports the conclusion that the passing of a civil service examination renders one "qualified" for a civil service position." *Id.* at 641, 730 A.2d at 946.

7. However, we note that this does not guarantee that Respondents will become Game Conservation Officers. To do this, Respondents would have to successfully complete the training period for this position. A "training period" is "[t]he period of time prescribed for a trainee class, during which the incumbent receives general or specialized training, or both, upon the **successful completion** of

which the trainee is promoted without further examination to the class for which trained." 4 Pa.Code § 91.3 (emphasis added). "Trainees who are unsuccessful in the training shall be removed promptly." 4 Pa.Code § 97.37. If Respondents did not successfully complete the training, they would not have a property right in continued employed as Game Conservation Officers. *See also Pipkin v. Pennsylvania State Police*, 548 Pa. 1, 7, 693 A.2d 190, 192 (1997) (State Troopers on probationary status do not have a property right in continued employment).

*Commonwealth of Pennsylvania, Department of Education*, 36 Pa.Cmwlth. 403, 387 A.2d 1022, 1023 (1978) ("A complainant has no standing to contest the validity of a law because of its affect on the putative rights of other persons") and *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ("this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Similarly, in the case *sub judice*, the Game Commission cannot use the fact that the orders of the Game Commission affected the protected rights of Respondents as the basis for asserting its right to a hearing. Although Section 101 defines an adjudication as a final ruling that affects the protected rights of any or all the parties, it is logical that only those parties whose rights are affected by that ruling are granted the benefits and protections of the AAL, such as a hearing. Thus, the orders were not adjudications as to the Game Commission, although they were adjudications as to Respondents. Therefore, the Game Commission was not entitled to a hearing and was not deprived of due process.

■ Additionally, the Game Commission does not have standing to appeal the orders of the Civil Service Commission to this Court. Section 702 of the AAL provides that:

> Any person aggrieved by an adjudication of a Commonwealth agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure).

2 Pa.C.S. § 702. It is well settled that "a person who is not adversely affected in any way by the matter he seeks to challenge is not 'aggrieved' thereby and has no standing to obtain a judicial resolution of his challenge." *Wm. Penn Parking Garage, Inc. et al. v. City of Pittsburgh*, 464 Pa. 168, 192, 346 A.2d 269, 280 (1975). Because the Game Commission had no protected interest in keeping Respondents off the list, it also reasonably follows that the Game Commission is not a "person aggrieved" by the Civil Service Commission's orders and therefore has no standing to appeal those orders.

Accordingly, because the Game Commission lacks standing to appeal the orders of the Civil Service Commission in this case, its Petitions for Review are dismissed.

### ORDER

AND NOW, January 7, 2002, the Petitions for Review filed by the Pennsylvania Game Commission (Game Commission) challenging the order of the Pennsylvania Civil Service Commission (Civil Service Commission) dated April 19, 2001 and docketed at Appeal No. LR2001–011 and the order dated April 26, 2001 and docketed at Appeal No. LR2001–006 are hereby dismissed and the Game Commission is ordered to comply with the above-referenced orders of the Civil Service Commission.